**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NORTH DAKOTA**

In Re:                                                                      Bankruptcy No. 20-30069

Phillip Sean Hebert and                                         Chapter 7
Shannon Lori Hebert,
f/k/a Shannon Lori Peterson,

                                Debtors.

_____/

Kip M. Kaler, as Bankruptcy Trustee for the
Bankruptcy Estate of Phillip Sean Hebert
and Shannon Lori Hebert,

                                Plaintiff,

                v.                                                          Adversary No. 21-07003

Shannon Lori Hebert, Stacy Lofton,
Robin Jemtrud, Atashia Jemtrud,
Judith Jemtrud, and Troy Peterson,

                                Defendants.

_____/

**MEMORANDUM AND ORDER**

## I.    INTRODUCTION

Kip M. Kaler, Chapter 7 Trustee, filed an Adversary Complaint seeking denial of

Debtor/Defendant Shannon Hebert's discharge under 11 U.S.C. § 727(a)(4) and (5).[1]

The Trustee alleges that Hebert failed to disclose prepetition transfers of $5,000 to

Defendant Judith Jemtrud and $25,000 to Defendant Troy Peterson with the intent to

hinder, delay or defraud creditors.  The Trustee also claims that the $25,000 transfer to

---

[1] In his pretrial brief, the Trustee acknowledged that Debtors provided information
regarding the transfers at issue and represented that he would not pursue his claim
under section 727(a)(5) at trial.  Accordingly, this cause of action is dismissed.

Peterson was a fraudulent transfer under 11 U.S.C. § 548(a)(1) and seeks a money judgment against Peterson in that sum.[2]

Hebert and Peterson filed an Answer to the Complaint, denying that Hebert transferred $25,000 to Peterson, failed to explain the transfer, or made a false oath about it in her bankruptcy.  Hebert and Peterson affirmatively allege that the $25,000 transfer to Peterson included a $10,000 payment to Peterson for work he performed for Hebert and repayment of a $15,000 loan he made to her.

The Trustee filed an Amended Complaint on October 18, 2021.  In his Amended Complaint, the Trustee alleges an additional $26,200 in transfers from Hebert to Peterson related to the section 548 cause of action and requests a money judgment against Peterson in the sum of $51,200.  Hebert and Peterson did not file an Amended Answer.

The Court tried this case on January 13, 2022.  For the following reasons, the Court finds in favor of the Trustee on most of his claims and causes of action.

## II.   FACTUAL BACKGROUND

Peterson is Hebert's son and Debtor Phillip Hebert's stepson.[3]  After graduating from college with a business degree, Peterson began working for Debtor Phillip Hebert. Debtor Phillip Hebert and Peterson formed Midwest Value Pros, LLC (MVP), a consulting firm for small businesses, in August 2016.  According to Peterson, their

---

[2] The Trustee also brought fraudulent transfer causes of action against Defendants Stacy Lofton, Robin Jemtrud, Atashia Jemtrud and Judith Jemstrud.  Doc. 1.  The Court granted the Trustee's motions for default judgment against each of these Defendants.  Doc. 29.

[3] Debtor Phillip Hebert is not a defendant in this adversary proceeding.  He did not testify at trial.

"ultimate plan" was for MVP to provide consulting services to Second Chance
Foundation, the nonprofit organization that Debtors and Peterson formed shortly after
MVP began operating.[4]  At the time, Debtors expected a large inheritance that they
planned to use to fund both MVP and Second Chance.  Peterson explained that they
created Second Chance to "do good" with the expected inheritance.  More specifically,
Second Chance focused on helping other area nonprofit organizations address issues
related to homelessness and disadvantaged families.

MVP hired Peterson as a consultant.  Hebert served as the business manager.
Hebert described Peterson's work for MVP as follows:

> He had multiple roles.  He worked as a business consultant for a car
> detailing company which consisted of marketing strategies for sales and
> employment recruiting.  He worked on employee and time management
> strategies to eliminate bottlenecks and maximize efficiency and on pricing
> with their management.  He also worked as a consultant for a small fast
> food place which was mainly focused on financials, building projections,
> breakeven points and overall debits and credits.

Ex. T-7 at 3.[5]  Peterson's work for MVP also included building the organizational model
for Second Chance.  Peterson did not sign an employment contract with MVP, but he
understood that his compensation would be $150,000 per year.

In addition to Peterson and Hebert, MVP employed Troy White.  Initially, MVP
used a payroll service to pay its three employees.  For reasons that are not clear from
the evidence, MVP discontinued using the payroll service at some point, and Debtors

---

[4] Although Debtors' Statement of Financial Affairs indicates that Second Chance
existed only in 2016, Hebert testified that information is incorrect because Second
Chance opened shortly after MVP opened, and it existed until two or three years ago.

[5] To provide Peterson with professional experience, Debtors arranged for
Peterson, as MVP's employee, to offer complementary consulting services to the car
detailing company and fast-food business, which were owned by Debtors' friends.

began paying employees from Hebert's personal account.[6]  Hebert also paid rent for the entities from her personal bank account.

Without ever generating income, MVP ceased operating in late 2017, and Peterson's and White's employment shifted to Second Chance.  Second Chance also employed Laura Viozzi and Carol Nowers.  As with MVP, Peterson did not sign an employment contract with Second Chance.  For reasons that he did not explain, Peterson reduced his expected annual compensation from Second Chance to $100,000.

Peterson's role at Second Chance included determining how to use Second Chance's anticipated financial resources to support disadvantaged members of the community.  He met with area nonprofit organizations to assess existing community services and to identify unmet needs related to homelessness, incarceration and disadvantaged individuals.  He also began working on a youth initiative for Second Chance.  Additionally, Peterson "did branding for . . . Second Chance including but not limited to websites, financial projections, company roles and responsibilities and short/long term plans and goals."  Ex. T-7 at 3.

Hebert was also "part of the team" that met with area nonprofit organizations. Although she received no compensation, she characterized herself as an employee of Second Chance.

Behind the scenes, Debtor Phillip Hebert's father, Richard Hebert, provided large sums of money to Debtors to fund both MVP and Second Chance as well as to pay

---

[6] Hebert received a salary only while MVP used the payroll service.

4

Debtors' household expenses.[7]  Debtors never received the large inheritance they expected.  Consequently, Richard Hebert's capital contributions were the only funds available for operating both MVP and Second Chance.  According to Hebert, Richard Hebert originally loaned Debtors the money he contributed but later forgave the debt.[8]

Debtors paid Second Chance's employees from Hebert's personal account, and the employees knew Debtors paid them from her account.  According to Peterson, he and the other employees were under the impression they worked for Debtors personally—and Debtors would pay them personally—because that was the agreement among everyone involved.  Peterson's understanding derived from conversations with Debtors.  Although Debtor Phillip Hebert was "basically the head of all of [MVP and Second Chance]" and "was making a lot of these decisions for the entities," Peterson discussed compensation with Hebert, and she was "on the same page."  When asked whether any of Peterson's work for MVP or Second Chance benefitted Hebert personally, Peterson responded, "Maybe in the way that she positioned herself in the community, but not in gaining income."

The problem with this arrangement was that Hebert only paid the employees intermittently because Richard Hebert provided funding intermittently.  According to

---

[7] Because Second Chance received funding from Richard Hebert, it did not solicit donations, and Peterson was not expected to fundraise for Second Chance.  Neither MVP nor Second Chance generated income because, according to Peterson, they were "set up not to take or gain or make.  They were set up to give or provide . . . because [Debtors] were expecting money to come in."

[8] In their original schedules, Debtors listed Richard Hebert as an unsecured creditor owed a debt of $3,670,776.69.  Debtors twice amended their schedules to adjust their debt to Richard Hebert.  On July 21, 2020, they reduced the sum of the debt to $191,008.40, and on March 2, 2021, they reduced it to $0.00.

Hebert, "We paid when we could."  Peterson testified he never received compensation on a regularly recurring basis from either MVP or Second Chance.  Peterson expressed frustration with the unpredictable compensation, claiming that "there were lots of conversations about compensation because I wasn't being compensated."  White, Viozzi and Nowers ultimately left Second Chance, presumably due to dissatisfaction with their compensation.  Peterson left Second Chance in early 2018.

White, Viozzi and Nowers sued Debtors, Peterson and his wife, MVP and Second Chance in state court in June 2018.[9]  According to Debtors' schedules, the former employees obtained a money judgment against Debtors in the sum of $359,489.12 on October 23, 2018.  Hebert explained that the lawsuit related to unpaid wages.  According to Peterson, the state court found him liable for Debtors' improper business practices because he was a co-owner of MVP.  Peterson paid $300,000 in damages to the plaintiffs, selling his house to make the payment.  At trial, Peterson argued Hebert is personally responsible for failing to pay the compensation she owes him for the same reason she is personally responsible for paying the judgment White, Viozzi and Nowers obtained.

A.    **Transfers**

Hebert transferred $5,000 from her personal account to Judith Jemtrud, her mother, on May 9, 2018.  Hebert also transferred $25,000 to Peterson from the same account on the same date.  The following day she transferred an additional $10,000 to Peterson.  Hebert also transferred the following sums to Peterson: $1,200 on May 31,

---

[9] The state court case filings are not a part of the record in this case.  The only evidence about the state court case is the limited testimony of Peterson and Hebert and Debtors' representations on their schedules.

2018; $5,000 on August 21, 2018; and $10,000 on August 22, 2018.  Hebert was insolvent at the time of all the transfers at issue in this case.[10]

Peterson testified that he did not request any of these transfers.  Rather, he asserted the transfers were money that Debtors owed him because they only paid him a "small portion" of what they agreed to compensate him.  As for the dates of the transfers, Peterson speculated that Debtors paid him when "the money came."  For example, Debtors paid Peterson $25,000 on May 9, the same date they received a $200,000 deposit by wire transfer.

The five transfers to Peterson at issue total $51,200.  Peterson testified he did not receive any other transfers from Hebert in the two years before Debtors' bankruptcy petition, February 2018 to February 2020.  Before February 2018, Peterson received some payments for his services, but he was unable to recall how much they totaled.  To the best of Peterson's recollection, all the compensation he received came from Hebert's personal account.  Over the course of his employment, he never knew when he would receive payment or how much a payment would be, characterizing the payments to him as "very irregular."  He insisted he did not receive money from Hebert for anything other than compensation and the loan repayment.

When asked how she decided when to transfer money to Peterson, Hebert explained that if Debtors had money in the account, Debtor Phillip Hebert would tell her to transfer a certain sum to Peterson.  She was unsure how much she had paid Peterson prior to the $25,000 transfer in May 2018, but "there were times that he would go two months without getting paid."

---

[10] The parties stipulated to the facts in this paragraph.

Although Hebert and Peterson were still communicating when she made the transfers to him in 2018, their relationship began to deteriorate because of the money Debtors owed him.  As of the trial date, Hebert and Peterson had not communicated in two years.

**B.    Bankruptcy**

Debtors filed a voluntary Chapter 7 petition for bankruptcy relief on February 7, 2020.  Debtors electronically signed the petition under oath after reviewing it with their attorney.  Debtors did not disclose the $5,000 transfer on May 9, 2018, to Judith Jemtrud.  Likewise, they did not disclose transfers to Peterson of $25,000 on May 9, 2018, $10,000 on May 10, 2018, $1,200 on May 31, 2018, $5,000 on August 21, 2018, and $10,000 on August 22, 2018.[11]  Debtors did not list Peterson as a creditor on their bankruptcy schedules.

Debtors' Statement of Financial Affairs filed as a part of their bankruptcy petition required Debtors to disclose any gifts exceeding $600 per person Debtors gave within two years preceding bankruptcy.  Debtors disclosed gifts to three relatives, but they did not list gifts to Jemtrud or Peterson.  Hebert could not recall why Debtors did not list the transfer to Jemtrud.  She explained that she did not list any transfers to Peterson because none of the transfers were gifts.  Instead, she characterized the transfers as compensation for work he performed.

---

[11] At trial, Hebert claimed she sorted through her bank account records before filing for bankruptcy and made notes about transfers reflected on them.  She gathered all the information about the transactions and gave it to Debtors' bankruptcy attorney (who did not represent her in this adversary proceeding).  She testified that, during her initial review, she was uncertain who received the $25,000 transfer on May 9, 2018, but she eventually determined she transferred this sum to Peterson and shared this discovery with her bankruptcy attorney.

Likewise, Debtors did not disclose the transfers to Peterson in response to Question 18 in the Statement of Financial Affairs, which requires Debtors to list the sale, trade or transfer of property to anyone, other than property transferred in the ordinary course of business or financial affairs, within two years preceding bankruptcy. They disclosed that they transferred household items in response to this question, however. Hebert testified that she did not think her monetary transfers to Peterson constituted the types of transfers described. Because the transfers to Peterson were "work related," Debtors considered the transfers "in the ordinary course of business."

Debtors filed amended bankruptcy schedules and Statements of Financial Affairs on July 21, 2020, and March 2, 2021, but they did not disclose the transfers to Peterson. On the advice of their bankruptcy attorney, Debtors disclosed the $5,000 transfer to Judith Jemtrud as a gift on their second amended Statement of Financial Affairs. They did not add the transfers to Peterson, claiming they owed compensation to Peterson for his work. At trial, Hebert acknowledged that Debtors did not disclose any transfers to Peterson in their bankruptcy schedules but claimed she was following the direction of her attorney.

### 1.    $25,000 Transfer to Peterson on May 9, 2018

At some point the Trustee discovered that Hebert transferred $25,000 to Peterson on May 9, 2018, prompting him to file his Adversary Complaint on February 4, 2021. The Trustee filed a Motion for Default Judgment against Troy Peterson on March 30, 2021. On May 3, 2021, Peterson filed an affidavit in support of his response to the motion acknowledging Hebert's $25,000 transfer to him. He explained that he

previously wired $15,000 to Hebert and that the other $10,000 of her $25,000 transfer to him was compensation for his work for MVP.

Attached to his affidavit is a copy of his Bell Bank statements with all transactions redacted other than the $25,000 transfer, including the $10,000 transfer from Hebert on May 10, 2018, that the Trustee had not yet discovered.[12]  Peterson testified that he did not redact the document, and he was not sure who redacted it.  He surmised that the bank may have redacted all the other information on the account statement because he asked specifically for documentation related to the $25,000 transfer at the Trustee's request.  Peterson asserted, "I wasn't hiding anything.  I sent you the full amounts and everything like that in [sic] a later date when you asked more specifically about anything else in 2018.  I figured you actually had that information, as, because, I didn't think you could hide information when you're filing bankruptcy.  So, I assumed you had all the information you needed.  You were asking about a specific transfer."

Peterson also attached a portion of his amended income tax return reflecting $10,000 in income from MVP to his affidavit.  Peterson testified that he amended his 2018 income tax return to include $10,000 in income around the time the former employees of MVP and Second Chance filed the state court lawsuit.  Peterson explained that he amended the return "to correctly claim income from [MVP]/Second Chance."  He wanted to ensure "everything was done correctly and how it should have been back then."  He claimed that when he first filed his return, he was receiving "advice

---

[12] Peterson did not provide his bank records from subsequent months that showed the other transfers from Hebert to Peterson that the Trustee discovered shortly before he amended his Adversary Complaint to include them.

from Phil on how I was supposed to . . . do my taxes.  In fact, if you go [to] 2016 and 2017, they were done by the same person that did [Debtors'] personal taxes as well."

Hebert served responses to interrogatories in connection with this case, which she signed under penalty of perjury.  In response to one of the questions asking why Hebert failed to disclose the transfers to Jemtrud and Peterson in her bankruptcy schedules, Hebert responded, "All information was presented to Attorney Bruce Madlom who prepared the schedules."  Ex. T-7 at 3.

The Trustee also included a question asking Hebert to explain the circumstances related to her $25,000 transfer to Peterson and her $5,000 transfer to Judith Jemtrud. She responded that the $5,000 transfer to Jemtrud was "to her mother for use in paying bills and personal expenses."  Ex. T-7 at 2.  She explained that $15,000 of the $25,000 transfer to Peterson was repayment of a loan to Hebert, and that the other $10,000 was payment for work Peterson performed for MVP.

Hebert noted that the $10,000 payment was the only compensation MVP paid Peterson.  When the Trustee highlighted at trial that Hebert made the $25,000 transfer to Peterson after MVP was no longer operating, Hebert claimed that the transfers were compensation for Peterson's work with Second Chance.

At trial, Hebert also testified briefly about the $15,000 loan from Peterson.  She was unable to recall any of the circumstances related to it, including what was happening at the time and why she needed the funds.  She explained that Debtors occasionally asked Peterson for money.

Peterson recalled more of the circumstances related to the loan.  Peterson explained that Richard Hebert transferred $30,000 to him on May 1, 2018, as a gift, and

11

Debtors knew about the gift.  Debtors had previously asked Peterson for money "a couple times," and they asked him for money on May 1, 2018, because "they did not have money."  Peterson characterized the May 1, 2018, transaction as a loan.  Although the parties did not negotiate formal repayment terms, Debtors told Peterson they expected to be receiving money and promised to repay him.

On May 9, 2018, eight days after Peterson transferred $15,000 to Hebert, Hebert received an incoming wire transfer of $200,000 from Richard Hebert.  She repaid the $15,000 loan the same day.  She could not recall why she asked her son for $15,000 if Richard Hebert possessed the resources to give her $200,000 approximately a week later.  Hebert also did not recall discussing with Richard Hebert the need for the $200,000 but commented that only Debtor Phillip Hebert asked Richard Hebert for money.

### 2. $26,200 in Transfers to Peterson between May 10, 2018, and August 22, 2018

In his interrogatories to Hebert, the Trustee asked:

> You claim that the payment of $25,000 from the debtor to Troy Peterson was in part for payment for work Troy Peterson performed in the amount of $10,000.  Identify all work performed by Troy Peterson for which he received payment.  As part of your answer, identify for whom he performed the work, his history of work for the entity, his rate of compensation for the two years preceding the transfer, and all payments made to Troy Peterson in the two years before the debtor filed bankruptcy.

Ex. T-7 at 3, Interrogatory No. 8.  Although Hebert responded to part of the Trustee's interrogatory, she failed to acknowledge the part of the question asking her to list all payments to Peterson within the two years before Debtors filed their petition and failed to list either the $25,000 the Trustee referenced or the additional $26,200 in transfers to Peterson.

12

The Trustee also asked Hebert to identify all transfers to Peterson in the two years before Debtors' bankruptcy, to which Hebert responded, "Previously provided." Ex. T-7 at 4, Interrogatory No. 10.  When asked at trial whether she knew what she was referring to when she answered, "Previously provided," she responded, "I do not. Again, I've never filed bankruptcy before and was under the advisement of attorneys."  She did not offer evidence that she "previously provided" the Trustee any information about the $26,200 in transfers from May 10, 2018, to August 22, 2018.

When asked why she only disclosed the $25,000 transfer to Peterson and not the other $26,200 in transfers, Hebert testified, "I apologize, I do not know.  We were not hiding the fact that these transfers went.  They were all in the bank accounts that were filed."

Peterson also provided answers to interrogatories in this case.  In them, Peterson acknowledged the $25,000 transfer to Peterson but not the other transfers from Hebert.  He also asserted that $10,000 of the $25,000 that he received as compensation for his services was "the only compensation that was paid to [Peterson] by [MVP]."  Ex. T-8 at 3.  When asked at trial how he squared this statement with the fact that he now acknowledges receiving a total of $51,200, Peterson responded that the question only asked about compensation from MVP, and the other $26,200 was compensation for his services to Second Chance.  Upon further questioning, however, he conceded that he did not know whether the additional $26,200 in transfers compensated him for work with MVP or Second Chance.

Like Hebert, Peterson answered the interrogatory asking him to identify all transfers from Hebert in the two years before Debtors' bankruptcy by stating,

"Previously provided."  Ex. T-8 at 3.  Peterson claimed at trial that the Trustee learned about the additional $26,200 in transfers through bank account records Peterson provided to the Trustee. He explained that he "knew that [the Trustee] had all of Shannon and Phil's bank accounts" because he "was told that" or assumed this fact.[13] When asked if he knew whether Debtors had disclosed the additional $26,200 in transfers to him, he answered, "No, not, yeah, not my job I guess."  But he conceded that, at the time these discovery requests were sent to him, everyone was operating under the assumption that the Trustee was only aware of the $25,000 transfer.  When asked if he knew at the time he responded to the interrogatories that he had not disclosed the additional $26,200 in transfers, he responded, "I didn't know that it was even a thing, to be honest, but I was aware that I had not disclosed it, if that helps, just by lack of information on my end."

In October 2021, the Trustee filed his Amended Adversary Complaint, increasing the total sum of the transfers to Peterson from $25,000 to $51,200.  Peterson filed a second amended 2018 tax return increasing the sum of his income to $37,000 "about the time" the Trustee filed the Amended Complaint.  Peterson asserted he filed this second amended return to reflect the additional income Peterson discovered when looking through records from 2018 for the Trustee.[14]  He claimed he only included the

---

[13] "When you're filing bankruptcy, I would assume—and maybe this is an incorrect assumption—that [the Trustee] had all of her bank accounts."

[14] Peterson acknowledged that, at the time he filed the first amended tax return, he was on notice that his 2018 income was under scrutiny, and that similar transfers he received from Hebert would have also been classified as income.  He claimed he did not "go deeper" until later because he assumed any amounts Debtors paid him from their bank account were already included on the bankruptcy.  Peterson also

$10,000 in income when he first amended his 2018 tax return because, "I had the same information you did so the $25,000 was all I could see because I was responding specifically to the $25,000 claim that you had sent.  Therefore, $25,000 was all I had info of at the time."  The Trustee pressed Peterson, questioning how Peterson did not have information about additional transfers when they were evident on his unredacted bank statements, but Peterson repeated that he specifically answered the Trustee's questions about the $25,000 transfer.  He clarified, "If you remember, I wasn't a part of the initial bankruptcy filing or any of that information.  My first knowledge of any of this was a document in the mail from you saying, 'You got $25,000 in 2018.  Why was this not included?'  Well, I was never a part of including the beginning of it, I didn't have anything to do with any of that.  I was just responding specifically to your request for the $25,000 transfer."

When asked whether he filed the amended tax returns solely because Peterson was notified by the Trustee that Peterson had received income, he answered, "Yes, but, however, again, at the time, when you, in 2018, when I would have first initially filed these, I never received any tax documents from MVP or Second Chance, and I was going under the guidance of Phillip Hebert, as far as how to handle that."

## III.   CONCLUSIONS OF LAW

### A.   Jurisdiction

This adversary action is a core proceeding under 28 U.S.C. § 157(b)(2)(J).  The Court has jurisdiction under 28 U.S.C. §§ 1334 and 157 and authority to enter a final

---

emphasized that "eventually I did get [the Trustee] the additional amounts—I provided those documents that [the Trustee] then amended the complaint against me with."

order in this matter.  This opinion constitutes findings of fact and conclusions of law in

accordance with Federal Rule of Bankruptcy Procedure 7052.

      **B.**    <u>**Denial of Discharge Under 11 U.S.C. § 727(a)(4)**</u>

      The Trustee seeks a denial of Debtor Shannon Hebert's discharge under 11

U.S.C. § 727(a)(4).  Section 727 of the Bankruptcy Code provides:

> (a) The court shall grant the debtor a discharge, unless—
>
>              \* \* \*
>
>     (4) the debtor knowingly and fraudulently, in or in connection with the case—
>
>         (A) made a false oath or account[.]

11 U.S.C. § 727(a).

      Denying a debtor a discharge is a harsh remedy.  <u>Snyder v. Dykes</u> (<u>In re Dykes</u>),

954 V.R. 1157, 1162 (8th Cir. 2020) (citing <u>Korte v. United States</u> (<u>In re Korte</u>), 262 B.R.

464, 471 (B.A.P. 8th Cir. 2001).  Accordingly, courts strictly construe section 727 in

favor of the debtor.  <u>Id.</u>  Even so, a discharge in bankruptcy and the associated fresh

start are privileges, not rights.  <u>Bauer v. Iannacone</u> (<u>In re Bauer</u>), 298 B.R. 353, 357

(B.A.P. 8th Cir. 2003) (citing <u>Grogan v. Garner</u>, 498 U.S. 279, 286 (1991)).  "The

opportunity for a completely unencumbered new beginning is limited to the honest but

unfortunate debtor."  <u>Id.</u>  The cost to the debtor for an unencumbered fresh start is

minimal, but it includes honestly and accurately disclosing his or her financial affairs and

cooperating with the trustee.  <u>Id.</u>; <u>see also</u> 11 U.S.C. § 521 (listing a debtor's duties in

bankruptcy).  "To prevail in an action to deny a debtor's discharge, the objecting party

must prove each element under § 727 by a preponderance of the evidence."  <u>Snyder v.</u>

Dykes (In re Dykes), 954 B.R. 904, 909 (B.A.P. 8th Cir. 2018) (citing Allred v. Vilhauer (In re Vilhauer), 458 B.R. 511, 514 (B.A.P. 8th Cir. 2011) and Fed. R. Bankr. P. 4005).

Section 727(a)(4)(A) bars the entry of discharge if a debtor knowingly and fraudulently made a false oath or account in or in connection with a case.  11 U.S.C. § 727(a)(4)(A).  To meet his burden under this subsection, the Trustee must prove by a preponderance of the evidence that "(1) Debtor made a statement under oath; (2) the statement was false; (3) Debtor knew the statement was false; (4) Debtor made the statement with fraudulent intent; and (5) the statement related materially to Debtor's bankruptcy case." Home Serv. Oil Co. v. Cecil (In re Cecil), 542 B.R. 447, 451 (B.A.P. 8th Cir. 2015) (citing Kaler v. Charles (In re Charles), 474 B.R. 680, 684 (8th Cir. B.A.P. 2012)).

Section 727(a)(4)(A) "requires nothing less than a full and complete disclosure of any and all apparent interests of any kind.  The debtor's petition, including schedules and statements, must be accurate and reliable, without the necessity of digging out and conducting independent examinations to get the facts."  In re Cecil, 542 B.R. at 453–54 (quoting Korte v. U.S. Internal Revenue Serv. (In re Korte), 262 B.R. 464, 474 (B.A.P. 8th Cir. 2001) (internal quotations omitted)).  "The debtor's duty of disclosure requires updating schedules as soon as reasonably practical after he or she becomes aware of any inaccuracies or omissions."  In re Bauer, 298 B.R. at 357.

"Full disclosure is required, not only to ensure that creditors receive everything they are entitled to receive under the Bankruptcy Code, but also to give the bankruptcy system credibility and make it function properly and smoothly[.]" In re Cecil, 542 B.R. at 454.  The disclosure requirement has implications beyond the administration of each

individual bankruptcy case because "failure to comply with the requirements of disclosure and veracity necessarily affects the creditors, the application of the Bankruptcy Code, and the public's respect for the bankruptcy system as well as the judicial system as a whole."  In re Korte, 262 B.R. at 474 (quoting Nat'l Am. Ins. Co. v. Guajardo (In re Guajardo), 215 B.R. 739, 742 (Bankr. W.D. Ark. 1997) (internal quotations omitted)).  As the Bankruptcy Appellate Panel recognized:

> Bankruptcy provides debtors with a great benefit: the discharge of debts. The price a debtor must pay for that benefit is honesty and candor.  If a debtor does not provide an honest and accurate accounting of assets to the court and creditors, the debtor should not receive a discharge.

In re Cecil, 542 B.R. at 453–54 (citation omitted).

The Trustee argues Hebert made numerous material misrepresentations in her schedules and Statement of Financial Affairs.  More specifically, he asserts that Hebert failed to list multiple transfers in the Statement of Financial Affairs, including a $5,000 transfer to Hebert's mother and multiple transfers to Peterson totaling $51,200.  The Trustee also claims Hebert made false statements about the same transactions in her discovery responses related to this adversary proceeding.

### 1.   <u>Statement Under Oath</u>

A debtor's signature on the bankruptcy petition, schedules and statements, made under penalty of perjury, are declarations which have the force and effect of "oaths" of the kind contemplated by section 727(a)(4)(A).  In re Charles, 474 B.R. at 684 (citation omitted).  Further, a debtor's representations in written discovery responses are also statements under oath for purposes of section 727(a)(4)(A).  Los Alamos Nat'l Bank v. Lamey (In re Lamey), 574 B.R. 240, 250 (Bankr. D.N.M. 2017); Sammarco v. Dini (In re

Dini), 560 B.R. 741, 761 (Bankr. N.D. Ill. 2016); Freelife Int'l LLC v. Butler (In re Butler),

377 B.R. 895, 922 (Bankr. D. Utah 2006).

Hebert signed her discovery responses and her bankruptcy petition, which

included her Statement of Financial Affairs.  She also testified that, when she signed her

bankruptcy petition, schedules and statements, she knew she was signing these

documents under oath.  Accordingly, the Court finds that the information Hebert

provided in her schedules, Statement of Financial Affairs and discovery responses are

statements under oath.  The Trustee satisfied his burden of proof under the first element

of section 727(a)(4)(A).

## 2.   False Statement that Hebert Knew was False

With her signature, Hebert acknowledged that the answers she provided in the

schedules, statements and discovery responses were true and correct.  At trial, she

insisted that she believed her answers were true and accurate when she made them.

She also maintains that, when Debtors discovered inaccuracies, they amended their

schedules and Statement of Financial Affairs.  For example, Debtors amended their

Statement of Financial Affairs to disclose the transfer to Judith Jemtrud as a gift.  Hebert

claims Debtors did not amend their schedules to disclose the transfers to Peterson

because the Statement of Financial Affairs did not require them to disclose transfers in

the ordinary course of business, and they considered the transfers to Peterson to be in

the ordinary course of their business.

Neither the Statement of Financial Affairs nor the Bankruptcy Code define the

phrase "in the ordinary course of business or financial affairs."  Krieger Craftsmen, Inc.

v. Ostosh (In re Ostosh), 589 B.R. 319, 350 (Bankr. W.D. Mich. 2018) (citing Stamat v.

Neary, 635 F.3d 974, 980 (7th Cir. 2007)).  "However, when determining the 'ordinary' nature of other types of transactions, courts have considered various factors, including the 'history of dealing between the parties,' to determine whether a particular payment was a 'customary or regularly occurring one.'" Id. (quoting Stamat, 635 F.3d at 980). Courts also consider consistency with other business transactions between the parties; the timing of the transactions; whether the transfers at issue involved an unusual payment method or resulted from atypical pressure to pay; the length of time the parties were engaged in the transactions at issue; whether the amount or form of tender differed from past practices; whether one of the parties engaged in any unusual collection or payment activity; and whether the creditor took advantage of the debtor's deteriorating financial condition. See Dooley v. Luxfer MEL Tech. (In re Fansteel Foundry Corp.), 617 B.R. 322, 325 (B.A.P. 8th Cir. 2020) (discussing ordinary course in the context of a preference defense); Concast Canada, Inc. v. Laclede Steel Co. (In re Laclede Steel Co.), 271 B.R. 127, 131–32 (B.A.P. 8th Cir. 2002) (same); Rice v. M-Real Estate LLC (In re Turner Grain Merch., Inc.), 595 B.R. 295, 307 (Bankr. E.D. Ark. 2018) (same); Tow v. Henley, 480 B.R. 708, 769–70 (Bankr. S.D. Tex. 2012) (considering whether the transfers debtors did not disclose on their Statement of Financial Affairs were in the ordinary course of their business for purposes of a section 727(a)(4) action).

Hebert asserts that the ordinary course of business for MVP and Second Chance involved funding operations with money Richard Hebert provided, like the transfers to Peterson at issue.  Since Debtors received Richard Hebert's gifts irregularly, Hebert suggests her irregular compensation disbursements were in the ordinary course of business.

Hebert's argument is based on a faulty premise—specifically, that the ordinary course of MVP's and Second Chance's business is at issue.  It is not.  MVP and Second Chance did not transfer the funds to Peterson.  Rather, Hebert transferred the purported "compensation" for work on behalf of the entities from her personal bank account.  The ordinary course of Hebert's business is at issue.

When the Trustee highlighted this faulty premise during oral argument, Hebert asserted, rather nebulously, that the basis for her personal liability to Peterson was the same as it was for the former employees who sued and obtained a judgment against her.  This argument lacks force because of the dearth of evidence supporting it[15] and because it does not explain how it was in the ordinary course of Hebert's business to pay the wages MVP and/or Second Chance purportedly owed to Peterson.  Hebert has not cited any authority for the proposition that a debtor's voluntary payment of debts owed by another entity is made in the ordinary course of a debtor's business or financial affairs, and the Court concludes there is insufficient evidence to support this claim under the circumstances of this case.

Even if Hebert had offered evidence sufficient to show she was personally liable for MVP's and Second Chance's unpaid salary obligations and regularly paid them from her account, she failed to establish that payments to Peterson satisfied a wage obligation paid in the ordinary course of her business.  For example, the lack of contemporaneousness between the exchange (his work for her money) weighs against finding that the transfers were in the ordinary course.  Hebert transferred the money to

---

[15] The Court received no background on the state court case from which to glean the legal basis for Hebert's liability to the former employees.

Peterson between May 9 and August 22, 2018, several months after Peterson left

Second Chance.  Further, the record includes scant evidence supporting any

connection between Peterson's earned compensation and the transfers.  The Court

received no evidence showing the hours Peterson worked, payroll taxes paid, vacation

earned or other standard employee records demonstrating Peterson earned the

compensation Hebert and Peterson ("Defendants") claim MVP or Second Chance owed

him.  Peterson's amendment of his income tax returns to reflect the additional "income"

after the Trustee discovered the transfers bolsters the proposition that Defendants did

not treat the transfers as compensation at the time the funds were "earned" or "paid."

Additionally, the evidence includes only vague references to "strategies" and

"consulting" projects assigned to Peterson with little showing the time it took him to

accomplish the tasks associated with them.  The connection between the tasks Hebert

lists and the compensation Peterson allegedly earned is tenuous, at best.

  The timing of the transfers—all of which Hebert made while insolvent—also fails

to support Hebert's claim that she transferred money to Peterson in the ordinary course.

To the contrary, it suggests she intentionally paid Peterson at the expense of the other

unpaid employees and other creditors.  In fact, former MVP/Second Chance employees

sued Hebert and Peterson amidst the transfers, showing pressure from unpaid

employees—rather than a customary or consistent business practice—likely prompted

the payments.

  The lack of regular payments in a consistent sum also weighs against Hebert's

claim that she transferred funds to Peterson in the ordinary course.  Although Hebert

argues that the transfers to Peterson at issue were irregular and intermittent like

previous compensation payments, their arguably consistent inconsistency does not transform them into payments made in the ordinary course.  Instead, it highlights that the ordinary course of compensating employees stopped after MVP/Second Chance discontinued the payroll service.

Rather than viewing Hebert's history of disregarding corporate formalities and sporadically paying employees from her personal account as indicia of the ordinariness of the transfers at issue as she advocates, the Court finds it exemplifies the questionable business practices imbuing this case.  Peterson's (and other employee's) knowledge that Hebert paid them from her personal account for their work for MVP and Second Chance does not alchemize them into payments in the ordinary course of Hebert's business.  After considering all the relevant circumstances, the Court concludes that the transfers to Peterson were not in the ordinary course of Hebert's business or financial affairs.  Accordingly, Hebert's failure to include the transfers in her Statement of Financial Affairs is a false statement.

Hebert's responses to the Trustee's interrogatories are even more problematic. Interrogatory 8 did not include the same "ordinary course" language.  Rather, the Trustee requested information related to "all payments made to Troy Peterson in the two years before the debtor filed bankruptcy."  Hebert did not list any transfers to Peterson in response to this question.  Although the questioned references Hebert's $25,000 to Peterson, Hebert offered no explanation for omitting the other $26,200 in transfers to Peterson at trial.  Her failure to list the other $26,200 in transfers is a false statement she knew was false.

Hebert also knowingly omitted reference to the $26,200 in transfers to Peterson from her response to Interrogatory 10.  In this interrogatory, the Trustee asked Hebert to identify all transfers to Peterson "in the two years before the debtor filed bankruptcy which have not otherwise been disclosed in the debtor's bankruptcy schedules."  Hebert answered, "Previously provided."  During trial, she could not articulate what information or documentation she had previously provided that disclosed the transfers.  She insisted that she never hid the fact that she made the transfers, and that she followed the direction of her bankruptcy attorney in her disclosures.  Although she referenced her bankruptcy attorney, she failed to offer evidence showing she omitted the transfers on the advice of counsel and disavowed reliance on the advice of counsel in oral argument. Given that the question was not complex or difficult to understand and after considering the circumstances, the Court concludes that Hebert knowingly omitted the additional $26,200 in transfers to Troy Peterson in her response to this interrogatory.

Finally, Hebert offered no explanation for omitting her $5,000 gift to Jemtrud on Debtors' initial Statement of Financial Affairs.  This omission is a false statement.  In the absence of any explanation for the omission, the Court concludes that Hebert knew it was false.

### 3.    Fraudulent Intent

The Trustee may establish the requisite fraudulent subjective intent with direct or circumstantial evidence.  See In re Cecil, 542 B.R. at 451.  The Court regards assertions, whether statements or omissions, made with reckless indifference to the truth as intentionally false.  See id.  "While courts are often understanding of a single omission or error resulting from an innocent mistake, multiple inaccuracies or

24

falsehoods may rise to the level of reckless indifference to the truth which is the functional equivalent of intent to deceive." Horizon Fin. Bank v. Borstad (In re Borstad), 550 B.R. 803, 833 (Bankr. D.N.D. 2016) (citations omitted). In this regard, "[T]he existence of multiple falsehoods, taken together with a failure on the part of the debtor to correct all known inconsistencies, omissions, and misstatements upon first amendment, constitutes reckless indifference to the truth and, thus, the requisite intent to deceive." Id. at 833–34 (citing Kaler v. McLaren (In re McLaren), 236 B.R. 882, 895 (Bankr. D.N.D. 1999)). "Since an admission or other direct evidence of fraudulent intent is rarely available, actual intent may be established by circumstantial evidence." Casamatta v. Holden (In re Holden), 542 B.R. 455, 459 (Bankr. W.D. Mo. 2015).

On the other hand, "Grounds for the denial of a discharge do not exist where a debtor completes his bankruptcy papers to the best of his abilities and attempts to be complete and accurate." In re Borstad, 550 B.R. at 833 (citations omitted). A bankruptcy court "should limit denial of discharge under the provisions of § 727(a) . . . to those cases where a debtor's actions are truly blameworthy in an equitable sense." Farmers Union Oil Co. v. Zinke (In re Zinke), 1994 WL 1887495, at *3 (Bankr. D.N.D. Apr. 18, 1994) (citing Panuska v. Johnson (In re Johnson), 80 B.R. 953, 960 (Bankr. D. Minn. 1987)).

The Trustee offered evidence that Hebert knowingly failed to disclose $26,200 in transfers to Peterson in her schedules and discovery responses. Because Hebert did not admit fraudulent intent, the Trustee invites the Court to rely on the badges of fraud to infer intent. See Ritchie Cap. Mgmt., LLC v. Stoebner, 779 F.3d 857, 861 (8th Cir. 2015); Stoebner v. Ritchie Cap. Mgmt., L.L.C. (In re Polaroid Corp.), 472 B.R. 22, 55–

25

56 (Bankr. D. Minn. 2012); Kaler v. Huynh (In re Huynh), 392 B.R. 802, 810 (Bankr.

D.N.D. 2008).

The Eighth Circuit Court of Appeals has looked to the "badges of fraud" for help

in determining actual intent "'regardless of whether the intent language came from a

state fraudulent transfer statute or applicable bankruptcy law.'" Ritchie, 779 F.3d at 861

(citation omitted).  Under North Dakota law, the "badges of fraud" or factors include:

    a.     The transfer or obligation was to an insider;
    b.     The debtor retained possession or control of the property
           transferred after the transfer;
    c.     The transfer or obligation was disclosed or concealed;
    d.     Before the transfer was made or obligation was incurred, the debtor
           had been sued or threatened with suit;
    e.     The transfer was of substantially all the debtor's assets;
    f.     The debtor absconded;
    g.     The debtor removed or concealed assets;
    h.     The value of the consideration received by the debtor was
           reasonably equivalent to the value of the asset transferred or the
           amount of the obligation incurred;
    i.     The debtor was insolvent or became insolvent shortly after the
           transfer was made or the obligation was incurred;
    j.     The transfer occurred shortly before or shortly after a substantial
           debt was incurred; and
    k.     The debtor transferred the essential assets of the business to a
           lienor that transferred the assets to an insider of the debtor.

N.D.C.C. § 13-02.1-04. This list is similar to those cited in bankruptcy cases. See, e.g.,

Doeling v. O'Neill (In re O'Neill), 550 B.R. 482, 500 (Bankr. D.N.D. 2016); Helena

Chem. Co. v. Richmond (In re Richmond), 429 B.R. 263, 305 (Bankr. E.D. Ark. 2010); In

re Huynh, 392 B.R. at 810. These lists are not exhaustive, and courts are free to

consider "any factors they deem relevant to the issue of fraudulent intent."  Ritchie, 779

F.3d at 863 (applying the factors in the context of a fraudulent transfer action under

section 548(a)(1)(A))[16] (quoting Jensen v. Dietz (In re Sholdan), 217 F.3d 1006,

1009−10 (8th Cir. 2000)); Dunker v. Bachman (In re Bachman), 2017 WL 3098093, at

*4 (Bankr. D. Neb. July 20, 2017).

The presence of a single badge is typically not sufficient to establish actual

fraudulent intent.  Brown v. Third Nat'l Bank (In re Sherman), 67 F.3d 1348, 1354 (8th

Cir. 1995). The confluence of several badges, however, creates a presumption of

fraudulent intent. Ritchie, 779 F.3d at 861–62; Kelly v. Armstrong, 141 F.3d 799, 802

(8th Cir. 1998); Dantzler v. Zulpo (In re Zulpo), 592 B.R. 231, 247 (Bankr. E.D. Ark.

2018); see also Rademacher v. Rademacher (In re Rademacher), 549 B.R. 889, 894

(Bankr. E.D. Mo. 2016) (noting that the presence of more than one badge of fraud

"strongly indicates that the debtor did, in fact, possess the requisite intent.").

Review of the record shows multiple badges of fraud in this case.  Hebert

transferred the money to Peterson, her son.  She was insolvent at the time of the

transfers, demonstrating Hebert's dire financial condition when she transferred the

funds to her son.  Although Hebert maintains that she was not trying to hide the

transfers, she failed to disclose them in her Statement of Financial Affairs and discovery

---

[16] Recognizing the nearly identical wording of Code sections 522(o), 548(a)(1)(A) and 727(a), the Eighth Circuit Court of Appeals and numerous bankruptcy courts apply the same standard of "intent to hinder, delay or defraud" a creditor to cases under these sections. See Addison v. Seaver (In re Addison), 540 F.3d 805, 811–12 (8th Cir. 2008); In re Sholdan, 218 B.R. 475, 481 (Bankr. D. Minn.1998), aff'd 217 F.3d 1006 (8th Cir. 2000) (citing cases) ("The Eighth Circuit has approved the use of the same inferential process in applying the statutory language 'with intent to hinder, delay or defraud creditors,' wherever that language is found—in state fraudulent-transfer statutes, 11 U.S.C. § 548(a), or 11 U.S.C. § 727(a)(2)"). This standard includes the badges of fraud analysis. In re Addison, 540 F.3d at 811–12; Dantzler v. Zulpo (In re Zulpo), 592 B.R. 231, 247 (Bankr. E.D. Ark. 2018) ("Courts have applied the inferential 'badges of fraud' approach to determine whether a debtor acted with fraudulent intent, regardless of which of these provisions is being construed.").

responses, suggesting she intended to keep them secret.  Hebert transferred the funds

to Peterson between May 9 and August 22, 2018, beginning shortly before the former

MVP/Second Chance employees filed the lawsuit and ending shortly before they

obtained judgment against her.  Finally, as discussed in more detail below, Hebert did

not receive consideration that was reasonably equivalent to the value of the transfers,

with the exception of the $15,000 loan from Peterson.  Accordingly, the Trustee offered

evidence sufficient to create a presumption of fraudulent intent, shifting the burden to

Hebert to rebut.  Hebert offered no legitimate explanation for the omissions.[17]  She

failed to meet her burden.  See Capital One Equip. Fin. Corp. v. Singh (In re Singh), 585

B.R. 330, 335–36 (Bankr. E.D.N.Y. 2018) ("Once a plaintiff produces evidence of a false

statement, the burden shifts to the debtor to produce a 'credible explanation.' If the

debtor fails to provide evidence that the false statement was unintentional, or to provide

a credible explanation, a court may infer fraudulent intent.") (internal citations omitted).

In fact, lack of a legitimate explanation, without more, justifies an inference that Hebert

recklessly or intentionally omitted transfers to Peterson from her Statement of Financial

---

[17] Although Hebert suggested at trial that she relied on her bankruptcy counsel when completing her schedules and statements and responding to discovery, her trial counsel expressly disavowed that Hebert affirmatively alleged a reliance on counsel defense.  In any event, "[W]hile 'a debtor who acts in reliance on the advice of counsel can lack the intent required to deny a discharge, reliance on advice of counsel is not a defense when it should be evident that the information should be included.'"  Arvest Bank v. Dokes (In re Dokes), 2017 WL 1743498, at *20 (Bankr. E.D. Ark. May 2, 2017) (quoting United States Trustee v. Killian (In re Killian), 2008 WL 5834017 at *7 (Bankr. D. Or. 2008)).  In this case, the necessity of disclosing the omitted transfers in Debtors' Statement of Financial Affairs should have been evident to Hebert.  The necessity to disclose the full $51,200 in transfers to Peterson in response to the discovery requests was crystal clear.  That Debtors' bank records Hebert supplied to her bankruptcy attorney included these transfers does not attenuate this conclusion.  Any argument Hebert made to the contrary is rejected.

Affairs.  See id.; In re Holden, 542 B.R. at 461 (debtor's explanations that she was "not

sure" why she failed to disclose transfers and that it "did not occur" to her were

unpersuasive, justifying the inference that she acted either recklessly or intentionally

and warranting a finding of fraudulent intent and a denial of discharge under section

727(a)(4)).

Additionally, Hebert offered no explanation for omitting the $5,000 transfer to her

mother on Debtors' Statement of Financial Affairs.  Consequently, the Court infers

Hebert's fraudulent intent for this omission as well.  Hebert's amendment to her

Statement of Financial Affairs to add this $5,000 transfer after the Trustee discovered

this omission does not alter this conclusion.  See Law Office of Larry A. Henning v.

Mellor (In re Mellor), 226 B.R. 451, 459–60 (D. Colo. 1998) (an inference of fraud is

permissible "when the evidence indicates that the amendment is not in fact voluntary

because the amendment is offered only as a result of developments during the meeting

of creditors, after the debtor 'knew that the cat was out of the bag,' well after the

meeting of creditors, or without adequate explanation of the reason for their initial

inaccuracy").

Hebert's failure to disclose the transfers demonstrates her focus on protecting

her interests and, even more likely, her son, with whom she had a fractured relationship.

Her conduct simply does not comport with the actions of an honest and truthful debtor

who takes her obligations under the Bankruptcy Code and the Rules of Civil and

Bankruptcy Procedure seriously.  See In re Larson, 546 B.R. 198, 210 (Bankr. D. Minn.

2016) ("The purpose of § 727(a)(4)(A), is to make certain that those who seek the

shelter of the Bankruptcy Code do not play fast and loose with their assets or with the

reality of their affairs. . . . 'Neither the trustee nor the creditors should be required to engage in a laborious tug-of war to drag the simple truth into the glare of daylight.'") (citations omitted).  Accordingly, the Court finds that the Trustee met his burden of proving Hebert intended to hinder, delay or defraud creditors.

### 4.    Materiality

A statement is material under 11 U.S.C. § 727(a)(4)(A) if it relates to or concerns the debtor's business transactions, the debtor's business or personal estate, the discovery of assets or the existence or disposition of the debtor's property.  Mertz v. Rott, 955 F.2d 596, 598 (8th Cir. 1992); Georgen-Running v. Grimlie (In re Grimlie), 439 B.R. 710, 717 (B.A.P. 8th Cir. 2010).  Hebert's failure to disclose the $5,000 transfer to her mother in the Statement of Financial Affairs and her failure to disclose all of her transfers to Peterson in her answers to discovery requests concerned her personal estate, the discovery of assets, the existence of her property and the disposition of her property.  Her omissions were material.  Accordingly, the Trustee met his burden of proving materiality.

In summary, the evidence supports the conclusion that Hebert's failure to disclose the $26,200 in transfers to Peterson in response to the Trustee's discovery requests and her omission of the $5,000 transfer to her mother on Debtors' Statement of Financial Affairs are knowingly false statements, which Hebert made with intent to hinder, delay or defraud the Trustee or her creditors, justifying denial of her discharge under section 727(a)(4)(A).

### C.    Fraudulent Transfer Under 11 U.S.C. § 548(a)

The Trustee asserts Hebert's transfers to Troy Peterson were fraudulent under Section 548(a)(1)(A) and (B).  Doc. 65 at 5.  Section 548(a) provides in relevant part:

> (1) The trustee may avoid any transfer . . . of an interest of the debtor in property, or any obligation . . . incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
>
>> (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or
>>
>> 5. (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
>>
>>> (ii) (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation[.]

11 U.S.C. § 548(a).

To avoid Hebert's transfers to Peterson under section 548, the Trustee must show that the transfers were made with actual fraudulent intent or that the transfer was constructively fraudulent. See BFP v. Resolution Tr. Corp., 511 U.S. 531, 535 (1994). Under both actual and constructive fraud theories, the party alleging the fraud bears the burden of proof by a preponderance of the evidence. Luker v. Eubanks (In re Eubanks), 444 B.R. 415, 422 (Bankr. E.D. Ark. 2010) (citations omitted); see also Kaler v. Craig (In re Craig), 144 F.3d 587, 590 (8th Cir. 1998).

### 1. Constructive Fraud

The Trustee may avoid transfers within the two-year period prior to the petition for bankruptcy relief by proving the following elements of constructive fraud under section 548(a)(1)(B):

> (1) an interest of the debtor in property; (2) was voluntarily or involuntarily transferred; (3) within [two years] of filing bankruptcy; (4) where the debtor received less than reasonably equivalent value; and (5) debtor was insolvent at the time of the transfer or became insolvent as a result thereof.

Sullivan v. Welsh (In re Lumbar), 457 B.R. 748, 753 (B.A.P. 8th Cir. 2011) (citing

Schnittjer v. Houston (In re Houston), 385 B.R. 268, 272 (Bankr. N.D. Iowa 2008)).

The Trustee met his burden of proving the first three elements of his section

548(a)(1)(B) claim. Hebert voluntarily transferred Peterson money within two years of

Debtors' bankruptcy, and Defendants concede Hebert was insolvent at the time of the

transfers. The only remaining question is whether Hebert received less than reasonably

equivalent value for the transfers.

As the Court explained in In re O'Neill:

> Courts consider three factors in analyzing reasonably equivalent
> value: whether "(1) value was given; (2) it was given in exchange for the
> transfer; and (3) what was transferred was reasonably equivalent to what
> was received." In re S. Health Care of Ark., Inc., 309 B.R. at 319 (citations
> omitted); In re Richards & Conover Steel, Co., 267 B.R. 602, 608 (8th Cir.
> BAP 2001) (citing Steffens v. Citicorp Mortgage, Inc., 148 B.R. 914, 916
> (Bankr. W.D. Mo. 1993)).
>
> The Bankruptcy Code defines "value" as "property in satisfaction or
> securing of a present or antecedent debt of the debtor, but does not include
> an unperformed promise to furnish support to the debtor or to a relative of
> the debtor." 11 U.S.C. § 548(d)(2)(A). "A transfer is in exchange for value if
> one is the quid pro quo of another." In re Richards & Conover Steel, Co.,
> 267 B.R. at 612; Kaler v. Able Debt Settlement, Inc. (In re Kendall), 440
> B.R. 526, 532 (8th Cir. BAP 2010).
>                                          * * *
> "There is no bright line rule used to determine when reasonably
> equivalent value is given." In re Lindell, 334 B.R. at 255 (citation omitted).
> Rather, courts consider the entire situation and base their analysis on the
> totality of circumstances. Id.; Sullivan v. Schultz (In re Schultz), 368 B.R.
> 832, 836 (Bankr. D. Minn. 2007) (citation omitted); In re Ozark Rest. Equip.
> Co., 850 F.2d at 345.
>
> The question of reasonably equivalent value is answered by
> determining "whether the debtor received 'value that is substantially
> comparable to the worth of the transferred property'" or, phrased another
> way, whether the debtor "received a fair exchange in the marketplace for
> the goods transferred." Courts also consider the "important elements" of "(1)
> fair market value and (2) whether there was an arm's length transaction."

32

Schnoor v. Dailey (In re Schnoor) 510 B.R. 868, 874 (Bankr. D. Minn. 2014) (citations and internal quotation marks omitted).

A monetary payment is unquestionably "value." In re S. Health Care of Ark., Inc., 309 B.R. at 319. Other benefits and burdens are considered "value" as well. . . . "If the measure for reasonable equivalency is the value of an indirect benefit then that benefit must be tangible." In re S. Health Care of Ark., Inc., 309 B.R. at 319 (citation omitted). Indirect, non-economic, intangible, psychological benefits, such as a possible burden on a marital relationship or preservation of a family relationship, are not sufficient to constitute reasonably equivalent value. Dietz v. St. Edward's Catholic Church (In re Bargfrede), 117 F.3d 1078, 1080 (8th Cir. 1997) (citations omitted). Ultimately, a "determination of reasonably equivalent value is 'fundamentally one of common sense, measure[d] against market reality.'" In re Schnoor, 510 B.R. at 874 (citation omitted).

In re O'Neill, 550 B.R. at 509–11 (footnotes omitted).

Defendants characterize $15,000 of the $51,200 Hebert transferred to Peterson as a loan payment. The Court finds this testimony credible. Bank records show Peterson transferred $15,000 to Hebert on May 1, 2018, eight days before Hebert transferred the money back to him. The exchange was dollar for dollar. Consequently, Hebert received reasonably equivalent value for this transfer. The Trustee failed to meet his burden of showing that the $15,000 loan repayment was constructively fraudulent under section 548(a)(1)(B).

Defendants argue that Hebert transferred the remaining $36,200 in funds to Peterson to compensate him for work he performed for MVP and Second Chance. The Trustee asserts Hebert did not receive reasonably equivalent value for these transfers because she did not personally owe an obligation to Peterson. Defendants emphasize that Hebert paid all business expenses for MVP and Second Chance from her personal account.

33

Hebert's choice to routinely pay MVP and Second Chance's business debts from her personal account does not show that Hebert received value for the money she transferred.  Rather, her conduct shows careless business practices and suggests Hebert felt a moral obligation to pay MVP's and Second Chance's debts.

In closing arguments, Defendants attempted to articulate the consideration Hebert received, asserting: "Hebert didn't receive consideration except for the fact that she had committed to pay the salary. And so, the consideration that she gets is that she's not obligated to pay the money which he received."  When the Court questioned the efficacy of the argument, Defendants argued, "She achieved a position in the community as somebody who was running these corporations to help people in need." These arguments fail because Defendants presented no evidence that Hebert received any direct or indirect economic benefit of any concrete value from the transfers.  See Leonard v. Mountainwest Fin. Corp. (In re Whaley), 229 B.R. 767, 775 (Bankr. D. Minn. 1999) ("In cases where the immediate benefit from a transfer is identifiable to a non-debtor third party, the burden shifts to the transferee to show that the debtor received a cognizable indirect benefit. The indirect benefit must have been both tangible and of concrete economic value.") (citations omitted).  The only possible value Hebert received for the transfers was community goodwill and the hope that the transfers would salvage her deteriorating relationship with her son.  These indirect, noneconomic, intangible psychological benefits are not adequate consideration for the transfers to her son.  See Dietz v. St. Edward's Catholic Church (In re Bargfrede), 117 F.3d 1078,1080 (8th Cir. 1997); Walker v. Treadwell (In re Treadwell), 699 F.2d 1050, 1051 (11th Cir. 1983) (holding that love and affection are not adequate consideration); Christians v. Crystal

Evangelical Free Church (In re Young), 152 B.R. 939, 948 (D. Minn.1993) (citation

omitted) ("A debtor cannot receive reasonably equivalent value for payments that are

made out of a sense of moral obligation rather than legal obligation") (citation omitted),

rev'd on other grounds, 141 F.3d 854 (8th Cir. 1998); Leonard v. Mountainwest Fin.

Corp. (In re Whaley), 229 B.R. 767, 775 (Bankr. D. Minn.1999) ("The easing of personal

strain that had resulted from the existence of the debt, or the more general promotion of

love, affection, or other personal tie, is too intangible for reasonable equivalence.")

(citing In re Bargfrede, 117 F.3d at 1080).

Even if Hebert had offered evidence that she received value for the transfers,

Defendants failed to show she (or MVP or Second Chance) received reasonably

equivalent value.  Defendants' testimony supports their claim that Peterson gave some

value to MVP and Second Chance through his work for the entities.  Unfortunately, the

Court cannot assess or quantify whether the value he gave exceeds the consideration

Hebert paid him based on the limited evidence presented at trial.  Peterson's testimony

that Debtors owed him money at the time of the transfers because they only paid him a

"small portion" of what they agreed to pay him lacks specificity.  Similarly, Peterson

testified he received compensation payments before the transfers at issue, but neither

he nor Hebert recalled how much they totaled.  Also, the Court received no evidence

regarding the total compensation he earned and the debt Debtors, MVP or Second

Chance owed him.

The Trustee met his burden of showing that Hebert received less than

reasonably equivalent value for the $36,200 in transfers to Peterson.  The transfers

were constructively fraudulent under section 548(a)(1)(B).

### 2. Actual fraud

Because the Trustee prevailed under his constructive fraud cause of action regarding the $36,200 in transfers to Peterson, the Court need not address his allegations of actual fraud related to these transfers. The only remaining issue is whether Hebert's $15,000 transfer to Peterson to repay a loan was fraudulent under section 548(a)(1)(A).

To succeed on his section 548(a)(1)(A) fraudulent transfer claim, the Trustee must show: (1) the debtor had an interest in property, (2) the debtor voluntarily or involuntarily transferred that interest, (3) the transfer occurred on or within two years before the debtor filed for bankruptcy relief, and (4) the debtor made the transfer with actual intent to hinder, delay or defraud any creditor of the debtor on or after the date of the transfer. 11 U.S.C. § 548(a)(1); see also Kaler v. McLaren (In re McLaren), 236 B.R. 882, 898 (Bankr. D.N.D. 1999); Allred v. Hauser (In re Jundt), 2014 WL 2742868, at *6 (Bankr. D.S.D. June 17, 2014). Defendants concede all the elements of the claim except that Hebert made the transfer with the intent to hinder, delay or defraud any creditor.

As with intent under section 727, Courts consider the badges of fraud to ascertaining a debtor's intent under section 548(a). See n.16, infra. As noted above, the Court finds Defendants' testimony about the loan and the repayment credible. Also, unlike Hebert's $36,200 transfers for alleged compensation to Peterson, Hebert received dollar-for-dollar consideration for the loan repayment. The equivalency of this exchange weighs in Peterson's favor. Additionally, Peterson loaned Hebert $15,000 on May 1, 2018, and Hebert repaid Peterson on May 9, 2018. Both transactions occurred

before the former employees filed a lawsuit against her.  Weighing all the circumstances, the Court finds that the Trustee failed to offer evidence sufficient to create a presumption of fraudulent intent related to Hebert's repayment of the $15,000 loan.  To the extent the Trustee claims that Hebert's repayment of the $15,000 loan was a fraudulent transfer under section 548(a)(1)(A), this cause of action is dismissed.

## IV.   CONCLUSION

For the reasons stated above, the Court finds in favor of the Trustee and denies Debtor Shannon Hebert's discharge under section 727(a)(4) because she knowingly and fraudulently made false oaths in connection with her bankruptcy case.  The Court also finds in favor of the Trustee and against Defendant Troy Peterson under section 548(a)(1)(B) related to Hebert's transfers to Peterson totaling $36,200.  The Court denies the Trustee's request for relief to the extent he asserts a fraudulent transfer cause of action related to the $15,000 loan repayment.

The Court considered all other arguments and deems them without merit or unnecessary to address.

**JUDGMENT MAY BE ENTERED ACCORDINGLY.**

Dated: April 22, 2022.

SHON HASTINGS, JUDGE
UNITED STATES BANKRUPTCY COURT